**Michael JILES, Appellee,**

v.

**Keith INGRAM, Mayor
of West Memphis;**

**City of West Memphis; Appellant,**

**West Memphis Fire Department;**

**Mack Holmes, Individually, and as Chief
of the West Memphis (Arkansas)
Fire Department; Appellant.**

**Mike Hardage; Forrest Dunlap; William Dunlap; William Burnett; Richard Linsky; Sam Lehr; Al Boals; Prichard Horton; Joe Brasfield; Roberta Jackson; James E. Cooper, Rev. James E. Cooper.**

**No. 90–1764.**

United States Court of Appeals,
Eighth Circuit.

Submitted March 14, 1991.

Decided Sept. 5, 1991.

Terry R. Ballard, North Little Rock, Ark., argued (David C. Peeples, West Memphis, Ark., on the brief), for appellant.

Roy C. Lewellen, Marianna, Ark., argued (Mark Burnette, Little Rock, Ark., on the brief), for appellee.

Before FAGG and LOKEN, Circuit Judges, and HAMILTON,* District Judge.

LOKEN, Circuit Judge.

The City of West Memphis, Arkansas, and its Fire Chief, Mack Holmes, appeal the district court's [1] judgment in favor of Michael Jiles, a black firefighter, after a court trial of his Title VII discriminatory discharge claim. Appellants argue that the district court's ultimate finding of discriminatory discharge is inconsistent with its finding that the individual defendants did not intentionally discriminate. Finding no such inconsistency, we affirm.

## I.

Jiles was discharged on August 5, 1987. He commenced this action in December 1988 seeking equitable relief and damages under both Title VII and § 1983. As tried to the court in March 1990, plaintiff presented a Title VII disparate treatment

---

\* The HONORABLE JEAN C. HAMILTON, United States District Judge for the Eastern District of Missouri, sitting by designation.

1. The HONORABLE STEPHEN M. REASONER, United States District Judge for the Eastern District of Arkansas.

claim for wrongful discharge, a Title VII disparate impact claim for wrongful failure to promote,[2] and a § 1983 claim. Defendants were the City and its Fire Department, Chief Holmes, Mayor Keith Ingram, and the members of the City Council. Following is a summary of the evidence at trial, viewed most favorably to the district court's findings. *See* Fed.R.Civ.Proc. 52(a); *Uniroyal, Inc. v. Mumford*, 454 F.2d 1233, 1236 (7th Cir.1972); *Crews v. Cloncs*, 432 F.2d 1259, 1265 (8th Cir.1970).

Jiles was hired by the West Memphis Fire Department in 1977 as a hose man, an entry-level position. He passed a written test and was promoted to driver in 1980. Between 1980 and his discharge in mid–1987, Jiles took the written test for promotion to lieutenant at least three times but was never promoted. By the end of 1986, however, Jiles was serving as Acting Lieutenant in charge of Station 4, though he continued to be paid only a driver's salary.[3]

On January 1, 1987, defendants Ingram and Holmes became the City's Mayor and Fire Chief. Holmes was aware that Jiles had asked not to be transferred to Station 2 because the officer in charge of that station, Lieutenant Reed, did not want to work with Jiles because he is black. Nevertheless, on July 25, 1987, the day Jiles learned that he had failed the 1987 promotion exam, Holmes transferred Jiles to Station 2, a transfer that immediately triggered the incident that led to Jiles's discharge.

Jiles testified that when he arrived at Station 2, Lieutenant Reed said that he was "in charge" and ordered Jiles to remove his gear from Jiles's bed where Jiles had set it down upon his arrival. Reed then instructed Jiles to help with some yard work, which he did. After lunch, Lieutenant Reed told Jiles that they would take the truck out for a drive, commenting that Captain Adomyetz, Reed's superior, "told me it would be all right to take you out on a test run."

Jiles drove the truck, an old "pumper," in 90 degree weather for about an hour and a half when Lieutenant Reed suddenly told him to stop "free wheeling."[4] Jiles replied that he wasn't free wheeling, to which the Lieutenant said, "If I say you're free wheeling, you are free wheeling." When Jiles again protested, Lieutenant Reed told him to "hush up." Jiles said, "You can talk to me in a better manner than that, than hush up." At this point, Reed ordered Jiles to return to headquarters, where Captain Adomyetz gave Jiles a counseling form stating that Jiles was unable to get along with Lieutenant Reed, had been "back talking" to Lieutenant Reed, and was being sent home until Chief Holmes could consider whether to transfer him. Jiles added his comments on the form, stating that Lieutenant Reed had been harrassing him and that the Captain suggested that he go home.

Jiles returned on the following Monday and attended a hearing before Chief Holmes. As reflected in trial exhibit 9, a verbatim transcript of this proceeding, this inquiry was less than impartial. The district court commented:

> Quite frankly ... it is clear that Chief Holmes acted as judge, jury, and executioner in that case. His questioning of

---

**2.** For a description of the difference between Title VII disparate treatment and disparate impact claims, *see Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988).

**3.** At the time Jiles was fired, the Fire Department employed no black officers (those with a rank higher than driver), even though blacks had worked as firefighters for more than fifteen years. In the early 1980's, Jiles and other black firefighters filed a complaint challenging the Department's testing for promotion. That case was settled in 1985. Jiles's disparate impact claim at trial was based upon alleged violations of that settlement agreement plus testimony that

white firefighters were given advance copies of at least one test, that the only test passed by black firefighters was thrown out, and that Jiles may have failed one test because his answer sheet was tampered with. Jiles has not appealed the district court's ruling that this proof fell short of establishing a disparate impact Title VII violation.

**4.** Free wheeling, at least as understood by Jiles, is driving the truck with the clutch depressed, in particular around a corner, for longer than is necessary to shift gears. The Fire Department had never defined free wheeling, nor proscribed the practice, either formally or informally.

Mr. Jiles was as in cross-examination, it was tough, it was accusatory, and his questioning of Lieutenant Reed was very much what we would call sort of softball questions.

After the hearing, Chief Holmes recommended that the Mayor terminate Jiles for "intentional failure to follow instructions." Mayor Ingram held a hearing on this recommendation two days later, at the conclusion of which the Mayor decided to "uphold the recommendation" and terminated Jiles.

Jiles also presented evidence pointing to a history of disparate disciplinary treatment of black and white firefighters. Jiles and other black firefighters testified to specific instances of misconduct, including criminal behavior, by white employees for which they received minor discipline or were not disciplined at all. This pattern and practice was not contradicted, and to some extent was confirmed by the City's own witnesses. For example, although he insisted that a driver's refusal to follow any instruction was a very serious offense, Chief Holmes admitted that no one other than Jiles had ever been discharged for that offense during Holmes's tenure, including a white driver who was found after an investigation to have used an obscenity in refusing to obey an order to return to his truck. Chief Holmes explained that discharge was not warranted in that case because the refusal was communicated through the driver's hose man and the driver eventually returned to his truck. Jiles also introduced uncontroverted testimony of racial slurs by white Fire Department officers, including Captain Adomyetz, Reed's commanding officer in the free wheeling incident.

At the conclusion of plaintiff's case, the district court stated that Jiles had proved a prima facie case of wrongful discharge under Title VII, consistent with the order of proof formula of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Defendants then called Chief Holmes and Mayor Ingram, who testified as to the non-discriminatory bases for their discharge recommendation and decision.

Chief Holmes testified that his recommendation was based entirely on Jiles's refusal to obey Reed's order to stop free wheeling. Holmes stated that he considered any refusal to follow instructions a serious offense in his "para-military type organization." In response to questions by the court, Holmes admitted that Jiles could not have obeyed Reed's order if Jiles had not in fact been free wheeling but stated that he believed Reed's version of their encounter. Mayor Ingram testified that his decision to discharge was based in part upon his review of Jiles's entire personnel file, which suggested to the Mayor a "common thread" of insubordination. Neither Lieutenant Reed nor Captain Adomyetz testified for the defense, so that Jiles's testimony as to the free wheeling incident went uncontradicted.

At the end of trial, the district court announced its findings of fact and conclusions of law from the bench, as expressly permitted by Rule 52(a). The court ruled in favor of Jiles on the Title VII wrongful discharge claim, stating:

First on the Title VII claim for discharge, the Court finds the issues in favor of the Plaintiff on that claim. The only evidence before the Court about what actually happened that day in the truck is from Mr. Jiles. There was not any testimony refuting that, and the Court ... *does not have to find in one of these cases that the Chief and the Mayor intentionally discriminated against Mr. Jiles,* but I think I have to take Mr. Jiles' version that he was not free-wheeling and had not disobeyed an order, and that for whatever reasons it appeared that Mr. Jiles was just simply not going to be believed ... and more importantly, intent aside, there's just not any evidence in the record that any white employee of the fire department who was similarly situated was ever given this sort of a punishment. And this is a man who had been on the force for 10 years, and, therefore, on the discharge claim the Court is going to have to rule in favor of Mr. Jiles.

(Emphasis added.) After ruling against Jiles on his disparate impact promotion claim, the district court stated that it was also dismissing the § 1983 claim:

> Since the Plaintiff has the burden of proof, I'm going to accept Chief Holmes' explanation ... that he intended to side with an officer against a non-officer rather than because of any racial reasons ... and I have to find intentional acts under 1983, and, therefore, I'm going to dismiss the 1983 claim, and I certainly don't find any intentional acts among the other Defendants that would justify a 1983 liability.

Based upon these findings and conclusions, the district court entered judgment ordering the City to pay Jiles back pay of $15,250 and ordering the City and Chief Holmes *in his official capacity* to reinstate Jiles. This appeal followed.

## II.

■ On appeal, the City and Chief Holmes contend that the district court erred in concluding that they violated Title VII when it specifically found no intentional racial discrimination. It is well settled that a Title VII plaintiff alleging discriminatory treatment must prove that the defendant intentionally discriminated. *See, e.g., Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). And we have held that a jury verdict of no discrimination in violation of § 1983 estops the court to find a disparate treatment violation in a companion Title VII claim. *See Catlett v. Missouri Highway & Transp. Comm'n,* 828 F.2d 1260 (8th Cir.1987), *cert. denied,* 485 U.S. 1021, 108 S.Ct. 1574, 99 L.Ed.2d 889 (1988). Thus, appellants' argument appears sound because of the way the district court stated its findings and conclusions. But the argument does not withstand close scrutiny of the district court's judgment.

The district court only granted Title VII relief against the City. Chief Holmes was enjoined only in his official capacity.[5] Appellants argue strenuously that Chief Holmes could not be liable in this Title VII disparate treatment case given the district court's express finding that he did not intentionally discriminate. That may well be true under *Catlett,* but it is irrelevant, since the district court did not hold him individually liable.

■ With respect to the City, we agree with appellants that Jiles had the burden to prove intentional discrimination. But that discrimination did not have to be by the Mayor or Chief Holmes or the City Council members, whom Jiles had joined as individual defendants. Disparate treatment by a governmental entity may be proved by pattern and practice evidence, *see Catlett,* 828 F.2d at 1265, and there was such evidence in this case. Moreover, Jiles's uncontradicted testimony, which the district court expressly credited, tended to prove that Lieutenant Reed did not want to work with Jiles because he is black and that Reed, perhaps with the complicity of Captain Adomyetz, contrived the freewheeling incident to get Jiles transferred out of Station 2 for racial reasons. That is sufficient proof of intentional discrimination by the City's agents to sustain the district court's conclusion that Jiles's resulting discipline, discharge, was the product of racially disparate treatment.

■ Jiles also presented evidence that the reasons given by Chief Holmes and Mayor Ingram for their decisions were pretextual, evidence that could have justified a finding that they, personally, intended to discriminate against Jiles. On the other hand, there is adequate record support for the district court's finding that these individual defendants did not personally intend to discriminate. These officials were relatively new to their posts in August 1987, and they promoted the first black firefighter to officer rank in the Department's history shortly after Jiles was discharged. In other words, on the facts of this case, there is no inconsistency between the district

**5.** Thus, it is difficult to see why Chief Holmes has appealed, except perhaps to camouflage this critical aspect of the district court's decision.

court's finding of no intentional discrimination by the two high ranking officials who made the final recommendation and decision to discharge, and its conclusion that the City was guilty of a disparate treatment violation because of the uncontradicted evidence of intentional discrimination by the lesser officials who initiated the discharge proceeding as well as the hostile work environment toward blacks. *See Ways v. City of Lincoln*, 871 F.2d 750, 755 (8th Cir.1989).

The uncontradicted evidence in the record amply supports the district court's decision that Jiles's discharge was the product of a disparate treatment violation. In light of this record, we decline the City's invitation to assume that the district court misapplied fundamental Title VII law by finding a disparate treatment violation but no intentional discrimination. The district court's findings and conclusions, stated from the bench at the end of a long day of trial, are somewhat ambiguous, but can readily be construed as consistent with each of its rulings and, most importantly, with its final judgment. Clearly, our task under Rule 52(a) is to do so: " '[A] district court's findings of fact must be liberally construed and found to be in consonance with the judgment if the judgment has support in the record evidence.' " *In re Fossum*, 764 F.2d 520, 522 (8th Cir.1985), quoting *Freeman v. Gould Special School District*, 405 F.2d 1153, 1157 (8th Cir.), *cert. denied*, 396 U.S. 843, 90 S.Ct. 61, 24 L.Ed.2d 93 (1969) and *Manning v. Jones*, 349 F.2d 992, 996 (8th Cir.1965).

Accordingly, we affirm the district court's judgment. The City must now reinstate Jiles and pay him $15,250.00 in back pay plus interest plus additional back pay to the date of reinstatement. We also order the City to pay the costs of this appeal, including the cost of preparing the trial transcript.