Katie **CHILDS**, Plaintiff/Appellant,

v.

Robert L. **WILLIAMS**, Ph.D.,
Defendant/Respondent.

No. 58661.

Missouri Court of Appeals,
Eastern District,
Division Two.

Feb. 4, 1992.

Jack B. Spooner, St. Louis, for plaintiff/appellant.

Jeffry S. Thomsen, James K. Muhlenbruch, St. Louis, for defendant/respondent.

STEPHEN N. LIMBAUGH, Jr., Special Judge.

Plaintiff, Katie Childs, having won a jury award of $50,000 on a claim of invasion of

privacy, appeals the trial court's grant of judgment notwithstanding the verdict. Ms. Childs also appeals the trial court's dismissal of a second count which alleged intentional infliction of emotional distress. We affirm.

The trial court granted j.n.o.v. for defendant because Ms. Childs failed to prove two essential elements of her cause of action for invasion of privacy or more specifically for public disclosure of private facts. These unproved elements, the court ruled, are (1) publication by defendant of "private facts" about plaintiff and (2) the absence of waiver by plaintiff of her right to privacy. Ms. Childs challenges these specific rulings.

On the claim of intentional infliction of emotional distress, Ms. Childs argues that the trial court erred in summary judgment proceedings by holding that Ms. Childs' sole expert witness, a psychologist, not a medical doctor, was precluded from presenting *medical* testimony. Because Ms. Childs could not then prove a *"medically diagnosable"* and *"medically significant"* mental injury as required under the cause of action, summary judgment was granted in favor of defendant.

## BACKGROUND

Katie Childs was hired in February of 1982 by Southwestern Bell Telephone Company (SWB) as a "programmer, entry level." For the next three years she enjoyed success in her employment, receiving annual promotions and pay raises. When conflicts arose between Ms. Childs and her immediate supervisor, LeAnn Crawford, Ms. Childs accused the supervisor of harassment. In January, 1985, due to the stress caused by the conflicts, Ms. Childs sought counseling through SWB's Employee Assistance Program (EAP). This program, staffed by in-house counselors, is designed to aid employees who suffer from any type of personal problems. After several counseling sessions during February and March, 1985, a decision was made to refer Ms. Childs to a private counselor, outside the EAP. Consequently, on April 6, 1985, she began treatment with defen-

dant, Robert L. Williams, a Ph.D. psychologist.

At Ms. Childs' first appointment with Dr. Williams, he required her to complete a two-page form in which she provided personal data and medical information. At the bottom of the second page of the form, Ms. Childs signed and dated a provision that reads:

AUTHORIZATION TO RELEASE INFORMATION:

I hereby authorize Robert L. Williams to release any information acquired in the course of my examination or treatment.

Although the initial treatment sessions were helpful, by May of 1985, Ms. Childs' work situation was worsening. To alleviate the increased stress, Dr. Williams admitted her as an in-patient in the Stress Management Program which he operated through Lindell Hospital. After obtaining a short-term disability leave from SWB, she spent the next six weeks in the Program undergoing daily therapy sessions with Dr. Williams.

During the hospital stay, Ms. Childs and Dr. Williams discussed several ways to overcome her problems at the work place. When Ms. Childs learned that her EAP counselor at SWB was a friend of LeAnn Crawford, the supervisor with whom the stressful conflicts had occurred, Dr. Williams agreed to request a change of in-house counselors. To facilitate that request, Ms. Childs executed an "AUTHORIZATION FOR THE RELEASE OF INFORMATION" directed to "Dr. Robert Williams, Lindell Hospital, CTU" and stating:

I, the undersigned hereby permit the above physician, hospital, or clinic, to release any and all data contained in my medical records which may be identified by the facts below. Therefore, the above person is released from all legal liability that may arise from the disclosure of this information.

At the end of the passage, Ms. Childs wrote in longhand, "to request a change of EAP counselors for theraputic [sic] purposes."

Additionally, at Ms. Childs' behest, Dr. Williams agreed to write SWB to recommend a job transfer, either a lateral transfer within the St. Louis office or a placement with SWB's Dallas, Texas office. They were optimistic that her stress problems would resolve if she was no longer required to associate with her supervisor, LeAnn Crawford.

Ms. Childs was discharged from Lindell Hospital on June 28, 1985. After a one-week vacation, she returned to work on July 10, 1985. In the interim, her EAP counselor (the idea to request a new counselor was abandoned) solicited from Dr. Williams "a professional opinion regarding Ms. Childs' ability to successfully manage the emotional stress that is inherent in her job function." Meetings were held on July 10 with Ms. Childs, her EAP counselor, LeAnn Crawford, and other supervisors. Angry and depressed by negative comments about her job performance, Ms. Childs suffered a relapse. The next day, July 11, she readmitted herself to Lindell Hospital.

Also on July 11, having had no contact with Ms. Childs since June 28, and prior to being informed of her readmission, Dr. Williams wrote a letter to Dave Heberer, Ms. Childs' division supervisor at SWB. Outlined in the letter are Ms. Childs' diagnoses of "severe emotional disorders" and "paranoid personality; obsessive compulsive personality." Also included are details of her prognosis and her "psychological test profile." The letter also states, "I strongly advise, indeed, urge you to consider transferring Ms. Childs to a position less stressful." Ms. Childs denies giving permission to write such a letter. On receipt of the July 11 letter, Dave Heberer had it placed in Ms. Childs confidential personnel file. The letter was accessible only by SWB supervisors who were in a direct line of command above Ms. Childs' position; supervisors above Ms. Childs but lateral in the management hierarchy had no access. The letter was eventually reviewed by

SWB's personnel manager, the EAP counselor, Heberer, LeAnn Crawford, and four others who at one time or another supervised Ms. Childs. Based in part on the information from Dr. Williams, Ms. Childs was demoted to a position she had held earlier at SWB. However, she was retained at the salary level she held before the demotion. Two years later, in 1987, she was terminated for reasons unrelated to this action.

It is Dr. Williams' letter of July 11, 1985, that provides the foundation for Ms. Childs' two causes of action.

## PUBLICATION BY DEFENDANT

■ In Count I, Ms. Childs alleges that Dr. Williams' letter, composed and delivered without her consent, constitutes the tort of public disclosure of private facts. This category of torts is a subset of the group of torts for invasion of privacy.[1] The four elements required for the cause of action are:

(1) publication or publicity,

(2) absent any waiver or privilege,

(3) of private matters in which the public has no legitimate concern,

(4) so as to bring shame or humiliation to a person of ordinary sensibilities.

*Y.G. v. Jewish Hosp. of St. Louis,* 795 S.W.2d 488, 498–99 (Mo.App.E.D.1990); *Brown v. Mullarkey,* 632 S.W.2d 507, 509 (Mo.App.E.D.1982). The latter two elements are not litigated in this appeal; we will assume they were established at trial.

■ Ms. Childs first argues that the trial court erred and abused its discretion in ruling as a matter of law that there was no publication by Dr. Williams. The term "publication" in the context of this cause of action means:

publicity "in the sense of communication to the public in general or to a large number of persons, as distinguished from one individual or a few."

1. Other invasion of privacy torts are (1) appropriation of another's name or likeness, (2) publicity that places another in a false light before the public, and (3) unreasonable intrusion upon

the seclusion of another. Each tort had distinct elements independent of the others. *Sofka v. Thal,* 662 S.W.2d 502, 510 (Mo. banc 1983).

*Brown,* 632 S.W.2d at 509 (quoting *Biederman's of Springfield, Inc. v. Wright,* 322 S.W.2d 892, 898 (Mo.Div. 2 1959)). The comment to Section 652D of the Restatement (Second) of Torts pertaining to public disclosure of private facts elaborates on the quality and degree of publicity required:

> The form of invasion of the right of privacy covered in this Section depends upon publicity given to the private life of the individual. "Publicity," as it is used in this Section, differs from "publication" as that term is used in § 577 in connection with liability for defamation. "Publication," in that sense, is a word of art, which includes any communication by the defendant to a third person. *"Publicity," on the other hand, means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.* The difference is not one of the means of communication, which may be oral, written or by any other means. It is one of a communication that reaches, or is sure to reach, the public.

Restatement (Second) of Torts § 652D comment (1977) (emphasis added).

*Biederman's,* 322 S.W.2d at 899, a debt collection case, is one of few Missouri cases to address the issue of publication in an action for public disclosure of private facts. The debtor established by counterclaim that on three separate occasions an agent of creditor came to the restaurant where debtor worked. In a loud tone of voice, the agent demanded payment from him and harassed and threatened him. *Id.* at 893. The court ruled that "the oral publication over the three-day period in a public restaurant with numerous customers present satisfies any reasonable requirement as to publicity." *Id.* at 898.

In *Brown,* 632 S.W.2d 507, a representative of plaintiff's employer, under subpoena duces tecum, brought plaintiff's personnel file to a deposition. *Id.* at 508. Prior to the deposition (which was eventually aborted) the contents of the file, including some items not covered by the subpoena, were shown to two other deposition participants. *Id.* This minimal disclosure was insufficient to constitute publication. *Id.* at 509.

More analogous is *Tureen v. Equifax, Inc.,* 571 F.2d 411 (8th Cir.1978), in which the federal court interpreted and applied Missouri substantive law on the publication question. *Id.* at 417. Defendant, an independent consumer reporting firm, reported to its client, an insurance company, the history of plaintiff's applications and claims with other insurance companies. *Id.* at 413. There was no dissemination of the report outside the insurance company's claims office. *Id.* Judgment was granted for defendant because plaintiff failed to show disclosure of the "private facts" to the general public. *Id.* at 419. Noting that Missouri law is not inconsistent with that set out in the Restatement (Second) of Torts, the court concluded:

> there must be evidence of publicity in the sense of a disclosure to the general public or likely to reach the general public, as opposed to "publication" required in a defamation action, in order for plaintiff to make a submissible case of invasion of privacy by public disclosure of private facts.

*Id.*

█ It is undisputed from the evidence that the July 11 letter was not a communication to the general public. However, in her brief, relying on *Biederman's,* Ms. Childs argues, "The key to what constitutes publication ... is the court's willingness to differentiate between a communication to the 'public in general' as compared to a communication to a large number of persons." She adds that the only indication of what is a "large number of persons" is that it is more than "a few" persons. However, her suggestion that publication to the "general public" is significantly different than publication to "a large number of persons," and that a plaintiff may opt for either alternative, is a misinterpretation of the *Biederman's* case. In *Biederman's,* the communications were made on three occasions to restaurant patrons, presumably a large number of per-

sons, more than a few. But, the emphasis of the opinion is that communications were made in a *public* restaurant, an environment conducive to the dissemination of the information to the public at large. It is of no consequence that private facts are communicated, even to a large group of persons, if by that communication the private facts are not made public. The critical aspect of the publication requirement is *public* disclosure—communications that are available to the general public, communications that have a likelihood of becoming public knowledge.

■ We hold that the composition and delivery of the July 11, 1985 letter to Ms. Childs' division supervisor, having been reviewed only by supervisors and others with a legitimate and direct interest in her employment, does not constitute publication as required in an action for p .olic disclosure of private facts.

## ABSENCE OF WAIVER BY PLAINTIFF

■ Ms. Childs fares no better with her next point—that the trial court erred in ruling as a matter of law that she waived her right to privacy. The trial court held that Ms. Childs made written and oral releases in favor of Dr. Williams and that in spite of her assertion that no consent was given, Dr. Williams was authorized to write the July 11, 1985 letter. The releases in question are (1) the April 6, 1985 "Authorization to Release Information" at the end of Dr. Williams' patient registration form,[2] (2) the June 13, 1985 "Authorization for the Release of Information" in which a change of EAP counselors was requested, and (3) Ms. Childs' verbal directions to Dr. Williams to obtain a job transfer.

The rules for interpretation of release provisions are well established. In *Montrose Savings Bank v. Landers*, 675 S.W.2d 668 (Mo.App.W.D.1984), the court states,

In interpreting the language of a release, the primary rule of construction, as in the case of construing any contract, is that the intention of the parties shall govern. Any question regarding the scope and extent of a release is to be determined according to what may fairly be said to have been within the contemplation of the parties at the time the release was given. This, in turn, is to be resolved in the light of all the surrounding facts and circumstances under which the parties acted.

*Id.* at 670–71. *See also Williams v. Riley*, 243 S.W.2d 122, 124 (Mo.App.E.D.1951).

Ms. Childs maintains that it was not the intention of the parties that any of the three releases would allow Dr. Williams to disclose highly sensitive and private medical information to her employer. She does not deny execution of the releases, even the verbal directions *for a job transfer*. Instead, she insists that Dr. Williams' conduct exceeded the scope and extent of the releases. Yet, she offers no proof of the proper scope and extent of the releases other than her own bare but persistent denial that permission was ever given to write the July 11 letter.

The first release can stand independently of the others. The intention of the parties may be gleaned without difficulty from the face of the document where it is said, "I hereby authorize Robert L. Williams to release any information acquired in the course of my examination and treatment." This language is plain, straightforward, and unambiguous. No restrictions or limitations are stated.[3] The obvious purpose is to allow Dr. Williams to communicate to other persons information about his patient's psychological condition. Ms. Childs would be hardpressed to declare that the

2. Ms. Childs also argues, for the first time on appeal, that this first release is invalid for want of consideration. This point was not preserved by objection or request at trial nor was it included in the motion for new trial. *Williams v. Barnes Hosp.*, 736 S.W.2d 33, 36 (Mo. banc 1987); Rule 78.07. Nor are we asked to invoke the plain error rule. Therefore, we decline re-

view. *See Fickbohm v. Schoonover*, 453 S.W.2d 1, 3 (Mo.App.S.D.1970); Rule 84.13.

3. That the language is unconditional does not necessarily mean the release can never be contested. For example, where release documents are executed as a result of fraud, as in *Montrose*, 675 S.W.2d 668, they may be invalidated.

release means something different than what it says.

The second release, however, is limited on its face to one purpose only: "to request a change of EAP counselors for theraputic [sic] purposes." Within this limited purpose, though, the release specifically and expressly permits disclosure of "medical records." Ms. Childs' positions are inconsistent: she claims that she would authorize the release of medical information to her employer to request a change of EAP counselors but not to request a job transfer.

The parties did not express any limits on the scope of the third release, the oral request to Dr. Williams that he procure a job transfer. Implicit in the direction to Dr. Williams is permission to disclose some private information. The ultimate complaint is that Dr. Williams exceeded the scope of that permission, that he went too far in revealing Ms. Childs' medical/psychological condition to her employer. Yet, the very reason for the job transfer was to alleviate that condition. Tacit permission for this disclosure had to have been contemplated by the parties. It would be implausible to direct Dr. Williams, as her treating psychologist, to plead for a job transfer and at once prohibit him from setting out the grounds therefor. Few employers would honor such a request.

In determining the import and scope of the three releases (assuming arguendo that the first release cannot stand independently), they should not be read separately, but together, all as parts of the "surrounding facts and circumstances under which the parties acted." *Montrose*, 675 S.W.2d at 670–71. In this context, they complement each other and they bolster each other. Each contributes to a total scenario which reveals conclusively that Ms. Childs authorized the release of her medical information and thereby waived her right to privacy.

PSYCHOLOGIST AS MEDICAL EXPERT

Ms. Childs pleaded a second count for intentional infliction of emotional distress. After the jury was selected and before opening statements, the trial court sustained Dr. Williams' motion for summary judgment. The court found that the cause of action required proof of a "medically diagnosable" and "medically significant" mental injury and that no expert medical witness had been endorsed. Moreover, the court refused to allow Ms. Childs' proposed expert, Dr. Miller Boyd, a psychologist, to testify on medical matters. Ms. Childs submits that the court erred and abused its discretion by these rulings.

■ To prove a claim for intentional infliction of emotional distress where no physical injury has occurred, it is necessary to show "emotional distress or mental injury" which "must be medically diagnosable and must be of sufficient severity so as to be medically significant." *Bass v. Nooney Co.*, 646 S.W.2d 765, 772–73 (Mo. banc 1982). Expert *medical* testimony is the exclusive means to meet this requirement. *Casey v. Casey*, 736 S.W.2d 69, 72 (Mo.App. E.D.1987). To qualify as an expert witness, a person must have specialized knowledge, skill, experience, training, or education within a given profession or calling. Section 490.065.1, RSMo Cum. Supp.1991. Medical doctors are presumptively qualified to testify in the field of medicine. The issue, then, is whether someone with credentials less than a medical doctor, in this case a psychologist, can qualify to testify as an expert medical witness.

■ Ms. Childs cites no Missouri authority for the proposition that psychologists may render medical testimony. Conceivably, a psychologist or other non-physician might attain a degree of knowledge, skill, experience, training, or education in medicine that would provide a foundation to become a medical expert. Dr. Boyd does not profess to have special qualifications above those of his profession. To the contrary, in his deposition, he states expressly that he cannot comment on Ms. Childs' mental problems with any medical certainty, or surmise that they were "medically significant."

It cannot be denied that there is overlap between the sciences of psychology and psychiatric medicine. However, by his ad-

mitted inability to testify on matters of "medical certainty" and "medical significance," Dr. Boyd, himself, recognizes that there are substantial differences between the two disciplines. On the facts of this case, it is unnecessary for us to rule definitively that psychologists can never testify on matters of medicine. We hold only that Dr. Boyd conceded his own inability to testify as a medical expert witness.

Therefore, we hold that the trial court did not err or abuse its discretion by prohibiting Dr. Boyd's testimony and sustaining the motion for summary judgment.

The judgment of the trial court is affirmed in all respects.

SATZ and CRANDALL, JJ., concur.