**Mary KIENTZY, Plaintiff–Appellee,**

v.

**McDONNELL DOUGLAS
CORPORATION, Defendant–Appellant.**

**Nos. 92–1204, 92–2411.**

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 17, 1992.

Decided April 9, 1993.

Rehearing and Rehearing En Banc
Denied June 23, 1993.

Thomas C. Walsh, St. Louis, MO, argued (Dennis C. Donnelly and Sabrina M. Wrenn, on brief), for defendant-appellant.

Jerome J. Dobson, St. Louis, MO, argued, for plaintiff-appellee.

Before JOHN R. GIBSON and WOLLMAN, Circuit Judges, and STROM,* Chief District Judge.

JOHN R. GIBSON, Circuit Judge.

McDonnell Douglas Corporation appeals from a judgment in favor of Mary Kientzy on her Title VII and Missouri Human Rights Act sex discrimination claims. A jury returned a verdict for Kientzy on the state claim, finding that Kientzy's sex was a motivating factor in McDonnell Douglas' decision to terminate her employment. The jury awarded $50,000 in actual damages, $125,000 for mental anguish and suffering,

$25,000 for future mental anguish, and $400,000 in punitive damages. A magistrate judge [1] then found the Title VII violation, and awarded front pay of $75,000 and $142,172.02 as reasonable attorneys' fees. McDonnell Douglas argues: (1) that the magistrate judge erred in denying its motion for directed verdict because there was insufficient evidence of sex discrimination and overwhelming evidence that Kientzy's admitted misconduct caused her discharge; (2) that the magistrate judge erred in submitting the emotional damages issue to the jury, and in the alternative, should have granted remittitur; (3) that there was insufficient evidence to support the punitive damages award, that the magistrate judge improperly instructed the jury with regard to punitive damages, and alternatively, that the magistrate judge should have granted remittitur; and (4) that the magistrate judge erred in calculating the attorneys' fee award. We affirm all but the calculation of attorneys' fees, which we remand for further consideration.

McDonnell Douglas hired Kientzy in 1978 as a security guard in its guard services division. Approximately nine years later, McDonnell Douglas promoted Kientzy to lieutenant (the first and only female to achieve this rank). As a lieutenant, Kientzy's duties included making "out-building-runs"—motor vehicle trips from McDonnell Douglas' main facility to other facilities in the area. Kientzy drove a direct route to the other facilities until road construction caused considerable traffic congestion and delayed her trips. She then found an alternate route which took her within one block of her home. While Kientzy was taking the alternate route, she occasionally stopped at her home for lunch without obtaining her superior's express permission. McDonnell Douglas did not have a written rule regarding lunches for lieutenants who were on out-building-runs, and the lieutenants did not have a common understanding or formal training about which lunch plans were acceptable.

---

* The HONORABLE LYLE E. STROM, Chief United States District Judge for the District of Nebraska, sitting by designation.

1. The Honorable David D. Noce, United States Magistrate Judge for the Eastern District of Missouri, tried the case by consent. 28 U.S.C. § 636 (1988).

When Kientzy's immediate supervisor, Captain Bobby Miller, heard rumors that Kientzy had been going home for lunch, he informed his superior, James O'Gorman, chief of guard services. Rather than reporting the rumor to his immediate supervisor, John B. Gillis, O'Gorman broke the "chain of command"[2] and reported the matter to E.J. Sporleder, an investigator in McDonnell Douglas' security investigations department.[3] Sporleder conducted an investigation, saw Kientzy at home on several occasions, and interviewed Kientzy, who admitted that she "would stop at [her] house for a few minutes to eat lunch." Sporleder had Kientzy sign a statement admitting her conduct, and he submitted a written report of his investigation to a disciplinary committee.[4] In his report, Sporleder noted that Kientzy had violated several written company rules, including leaving the plant without permission. The committee voted to terminate Kientzy's employment.

After Kientzy learned of her termination, she contacted Gillis and John MacDonald, director of security, to determine if anyone could rescind her termination. MacDonald met with Vincent DeBlaze, the director of human resources, to see if there was a procedure for reviewing disciplinary committee decisions. Although no procedure for review existed, DeBlaze asked O'Gorman to find out whether other officers had gone home while on out-building-runs and whether anyone had told Kientzy that McDonnell Douglas prohibited employees from stopping at home. O'Gorman surveyed the officers regarding their and Kientzy's understanding of the lunch policy, and submitted a report to DeBlaze, who decided not to pursue the matter further.

Kientzy then brought this action, and the jury found that Kientzy had proved by a preponderance of the evidence that her sex was a motivating factor in McDonnell Douglas' decision to terminate her employment. The jury also found that McDonnell Douglas had not proved by a preponderance of the evidence that it would have terminated Kientzy's employment even if her sex had not been a motivating factor. The jury awarded $50,000 in actual damages, $150,000 for mental anguish and suffering, and $400,000 in punitive damages.

Reviewing the verdict, the magistrate judge made detailed findings of fact and stated that the jury's findings were binding under collateral estoppel principles. *Kientzy v. McDonnell Douglas Corp.*, No. 90–584 C(1), slip op. at 2–9 (E.D.Mo. July 23, 1991). The magistrate judge found that the disciplinary committee did not consider Kientzy's sex when it decided to terminate her because the members believed Kientzy had violated a rule that prohibited employees from leaving the plant premises without permission. *Id.* at 6, 9. The magistrate judge also found that Kientzy's sex was not a factor in DeBlaze's decision not to reconsider her termination. *Id.* at 8. The magistrate judge concluded:

[T]he discrimination in this case occurred when Mr. O'Gorman, first, referred plaintiff's case to the Security Investigations Department, instead of discussing the matter with his immediate superiors, and, second, failed to conduct the survey of Guard Services supervisors as he was directed by Mr. DeBlaze. The first action took consideration of plaintiff's case away from a more flexible disciplinary process than that which involved the Disciplinary Committee. The second action deprived plaintiff of the benefit of the probable reconsideration and possible modification of her termination discipline.

*Id.* at 9–10.

The magistrate judge affirmed the jury's award of $50,000 in actual damages and

---

2. O'Gorman reported to John B. Gillis, the manager of security plant protection, who reported to John MacDonald, the director of security. MacDonald reported to Vincent DeBlaze, the director of human resources, who reported to Darrell Waters, the vice president of human resources.

3. The security investigations department is completely separate from the guard services division, and outside the division's line management and "chain of command."

4. Once a matter is referred to security investigations, a disciplinary committee, rather than the employee's immediate supervisor, determines the appropriate discipline.

$150,000 for emotional distress, and awarded $75,000 in front pay in lieu of reinstatement. *Id.* at 11–16. The magistrate judge also granted McDonnell Douglas' request for a new trial on punitive damages, vacating the $400,000 award because the jury instruction did not adequately reflect Missouri law. *Id.* at 15. Upon reconsideration, however, the magistrate judge reinstated the punitive damages award, concluding that the instruction was proper and that there was sufficient evidence to support the award. *Kientzy v. McDonnell Douglas Corp.*, No. 90–584 C(1), slip op. at 1–2 (E.D.Mo. December 2, 1991).

## I.

■■■ McDonnell Douglas argues that the district court erred in denying McDonnell Douglas' motion for directed verdict because the overwhelming evidence demonstrated that Kientzy's discharge resulted from her admitted misconduct, not sex discrimination.[5] When reviewing the denial of a directed verdict, we must:

1) consider the evidence in the light most favorable to [Kientzy] ...; 2) assume that all conflicts in the evidence were resolved ... in [Kientzy's] favor; 3) assume as proved all facts which [Kientzy's] evidence tends to prove; 4) give [Kientzy] the benefit of all favorable inferences which may reasonably be drawn from the facts proved; and 5) affirm the denial of the motion if reasonable persons could differ as to the conclusions to be drawn from it.

*Morgan v. Arkansas Gazette*, 897 F.2d 945, 948 (8th Cir.1990) (quoting *Gilkerson v. Toastmaster, Inc.*, 770 F.2d 133, 136 (8th Cir.1985)); *see also Finley v. Empiregas, Inc.*, 975 F.2d 467, 473 (8th Cir.1992). Generally, we consider only evidence favoring

the nonmoving party. *Morgan*, 897 F.2d at 948; *see also Dace v. ACF Indus.*, 722 F.2d 374, 376 (8th Cir.1983), *as modified*, 728 F.2d 976 (8th Cir.1984); *Caudill v. Farmland Indus.*, 919 F.2d 83, 86 (8th Cir.1990). We recite the facts in this opinion as required by these cases.

■■■ In addition, our task on appeal is limited as we "will not assess the adequacy of a party's showing at any particular stage of the *McDonnell Douglas* [6]–*Burdine* [7] or *Price Waterhouse* analyses." *Finley*, 975 F.2d at 473; *see also United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714–15, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983); *Morgan*, 897 F.2d at 948. Instead, we focus our attention on "the ultimate factual issue of whether [McDonnell Douglas] intentionally discriminated against [Kientzy]," and we study the record to determine whether the evidence was sufficient to support submission of the case to the jury. *Morgan*, 897 F.2d at 948–49; *see also Finley*, 975 F.2d at 473.

Looking to *Price Waterhouse*, 490 U.S. at 241, 109 S.Ct. at 1785, McDonnell Douglas argues that to be liable for sex discrimination, Kientzy's gender must have been a factor in the disciplinary committee's decision at the moment it was made. Accordingly, McDonnell Douglas contends that it cannot be held liable because Kientzy admits and the magistrate judge found that the disciplinary committee's decision to terminate Kientzy's employment was free from discrimination. Kientzy, however, argues that our decision in *Jiles v. Ingram*, 944 F.2d 409 (8th Cir.1991), is analogous to her situation.

In *Jiles*, the district court held a city liable for intentional race discrimination because it found that two fire department

---

**5.** McDonnell Douglas asserts that the magistrate judge erroneously gave the jury a *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), mixed-motive instruction which required the jury to determine whether Kientzy's sex was a motivating factor in McDonnell Douglas' decision to terminate her employment. McDonnell Douglas, however, does not argue that it is entitled to reversal based on this claimed "instructional error" because it believes "the issue of discrimination

never should have gone to the jury in the first place."

**6.** *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

**7.** *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

officers had initiated disciplinary proceedings against a black firefighter, Jiles, for racial reasons. *Id.* at 413. The court also found that neither the fire chief nor mayor, who ultimately decided to discharge Jiles, had personally intended to discriminate. *Id.* On appeal, the city protested that the court's finding that the fire chief and mayor had not intentionally discriminated was inconsistent with holding the city liable. *Id.* We affirmed the district court, stating:

> [T]here is no inconsistency between the district court's finding of no intentional discrimination by the two high ranking officials who made the final recommendation and decision to discharge, and its conclusions that the City was guilty of a disparate treatment violation because of the uncontradicted evidence of intentional discrimination by the lesser officials who initiated the discharge proceeding as well as the hostile work environment toward blacks.

*Id.*

Similarly, in *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir.1990), a young supervisor set up an older employee when he presented a neutral career path committee with plausible evidence that the older employee should be discharged. The committee, unaware of any age animus on the supervisor's part, voted to terminate the employee. *Id.* The Seventh Circuit reversed the district court's grant of summary judgment, noting that even though a neutral committee made the ultimate decision to discharge the employee, the committee was likely "to defer to the judgment of the man on the spot." *Id.* The court stated that when a committee has "acted as the conduit of [a supervisor's] prejudice—his cat's paw—the innocence of its members would not spare the company from liability." *Id.; see also Gusman v. Unisys Corp.*, 986 F.2d 1146, 1147 (7th Cir.1993) (stating that "[a]n employer cannot escape responsibility for wilful discrimination by multiple layers of paper review, when the facts on which the reviewers rely have

been filtered by a manager determined to purge the labor force of older workers").

The Fifth Circuit has also considered a similar situation. In *Vaughn v. Edel*, 918 F.2d 517, 523 (5th Cir.1990), a supervisor decided that in order to avoid a race discrimination suit, no one should criticize a black employee, give her negative evaluations, or counsel her on work deficiencies. *Id.* at 521, 523. The evidence showed that the employee may have initially benefitted from this decision, but ultimately, she was fired (as one of the department's lowest performers) to meet cost-reduction goals. *Id.* at 523. The court stated that whether the decision ultimately benefitted or harmed the employee was irrelevant because the decision to not apply the usual procedures was racial and it deprived her of a chance to improve. *Id.* The court refused to "sterilize a seemingly objective decision to fire an employee when earlier discriminatory decisions have infected it." *Id.*

In *Jiles, Shager,* and *Vaughn,* the courts looked beyond the moment the decision was made. Likewise, we must focus on Chief O'Gorman's referral of Kientzy to the security investigations department and his after-the-fact survey and report to Vincent DeBlaze.

## A.

When Miller reported the rumor about Kientzy to O'Gorman, O'Gorman did not warn Kientzy or go to Gillis, his immediate superior within the guard services' chain of command. Instead, O'Gorman went to security investigations. O'Gorman knew that his referral would remove guard services from the decision making process and that the investigation could result in Kientzy's termination.[8] In contrast to O'Gorman's actions, Gillis testified that guard services normally handled its own disciplinary matters, including the termination of its employees. Gillis testified that Kientzy's situation "should have flown up through the chain of command," and that Kientzy

---

8. Between fifty and eighty percent of the cases brought before the disciplinary committee resulted in termination.

should have been "counseled and warned" because the lunch rule or understanding was "very hazy." Gillis testified that he did not know of any other instance where a chief had broken the chain of command and gone to security investigations.

When O'Gorman referred Kientzy's case to security investigations, he only told the security investigator, Sporleder, that officers did not have permission to go home. McDonnell Douglas, however, did not have any written rules regarding lunches for guard service captains or lieutenants, nor did the division provide formal training, orientation, or written policies about either permissible or impermissible conduct. In addition, some officers believed that an officer on an out-building-run could stop at home for lunch or to conduct other personal business. A retired guard services captain, Gerald Michael, testified that lieutenants "could stop and eat their meal, lunch bag, lunch box, if they took it with them," they could "stop at fast food and get a sandwich or coffee or whatever," and "there was no objection ever raised to stopping at your home for a sandwich or [to] use the rest room or whatever." He testified that there was no distinction between stopping and standing in line at McDonald's and going home to eat a sandwich. Ronald Dixon, a guard services lieutenant, testified that until the Kientzy incident, he thought a lieutenant on an outbuilding-run could stop at home to eat. He also testified that he had gone home for various reasons, including lunch, and did not believe he was violating any McDonnell Douglas policies at that time. Joseph Khoutek, another retired guard services captain, testified that lieutenants could go home and eat a sandwich if they lived in the proximity of a building they were attending or a route they took to the building. O'Gorman, on the other hand, believed that a lieutenant on an out-building-run could go into a restaurant and get food to go,[9] but could not go home because "going home violates *my* policy." (empha-

sis added). O'Gorman agreed that he had never told Kientzy about his policy, he did not make sure she knew the policy when he heard the rumors about her going home, and he never clarified the situation with Sporleder. Sporleder testified that if he had known other officers were going home or that no policy existed with respect to going home, he may have conducted his investigation differently and asked further questions.

O'Gorman also demonstrated an intense interest in Kientzy's investigation. Whenever Kientzy left the facility on an out-building-run, O'Gorman (or Miller under O'Gorman's orders) called Sporleder to tell him that she had left the building. Then each afternoon, O'Gorman or Miller called Sporleder to learn what had been discovered. O'Gorman stated that he was just curious to see if the rumors were true even though the investigation "was now in [Sporleder's] ball park."

In contrast, O'Gorman testified that he had never disciplined a male officer during his three years as chief. In April or May 1988, two months before Miller reported Kientzy, O'Gorman went to Gillis, his superior in the guard services' chain of command, to report that a male officer, Lieutenant Buchanan, had been wearing a beeper and doing personal business on company time. Gillis told O'Gorman to bring Buchanan to the office. Gillis verbally warned Buchanan that doing personal business on company time and wearing a beeper while on duty would not be tolerated. A short time after Kientzy's discharge, O'Gorman again went to Gillis to report that Buchanan had been disappearing for substantial amounts of time while he was on out-building-runs. Gillis told O'Gorman to turn Buchanan over to security investigations because he had already "been thoroughly warned and counseled and told what the repercussions ... would be if he disobeyed."

---

**9.** There was also conflicting testimony regarding stopping at a restaurant. Some believed a lieutenant could stop at the restaurant only to get food to go, others believed the lieutenant could sit down and eat, and at least one other employee believed it was impermissible to stop at a restaurant at all.

A second situation involving a male security guard, Dwight Bolden, arose sometime after Kientzy's discharge. O'Gorman approached Gillis, not security investigations, with information that Bolden had been seen driving a company vehicle to a local liquor store while he was on duty and in his security uniform. Gillis ordered O'Gorman and Miller to investigate the allegations against Bolden. O'Gorman and Miller confirmed the allegations, and O'Gorman confronted Bolden. O'Gorman then recommended a three week suspension even though Bolden's conduct clearly violated McDonnell Douglas' written rules and Kientzy had been terminated for violating an unwritten policy only a few months before.

There were also male officers, Lieutenants Moretto and Dixon, who informed O'Gorman immediately after Kientzy's termination that they had gone home while making an out-building-run. O'Gorman, however, did not take any action with regard to these male officers. O'Gorman did not ask Moretto any questions about the circumstances surrounding his trip home. He did not investigate Moretto's statement, recommend discipline, or refer Moretto to security investigations. Similarly, in response to Dixon's admission, O'Gorman suggested: "You had permission. Right." Dixon, responded, "right," and O'Gorman did not ask any other questions, investigate the circumstances further, or ask how many times Dixon had gone home. Dixon testified that before Kientzy's termination he had gone home for lunch on several occasions.

In addition, Captain Hoehn, Lieutenant Dixon, and Kientzy all testified at trial that before Kientzy was discharged there were wide spread rumors that four male officers were going home while on duty. These rumors were never investigated, and none of the officers was ever disciplined. Captain Khoutek also testified that he had gone home occasionally when he was on duty and O'Gorman knew about it. Even O'Gorman testified that he had gone home in a company vehicle for personal reasons on two different occasions.

### B.

After Kientzy had been terminated, O'Gorman played a key role when Kientzy attempted to get her job back or at least get the decision reviewed. DeBlaze specifically asked O'Gorman to find out if other officers had gone home and to determine if anyone had explained the policy to Kientzy. O'Gorman prepared a list of six questions that all dealt with the officers' understanding of Kientzy's understanding of the policy. In addition, O'Gorman asked: "What is your understanding of the subject of eating at home? Is the fact that you cannot eat at home a common sense item?" Lieutenant Dixon, however, testified that he had not been asked any of the six written questions; O'Gorman only asked him the last question. Dixon testified that he specifically asked O'Gorman whether that question referred to his understanding of the policy before or after Kientzy's termination because the question did not differentiate between the two time periods and after Kientzy's discharge everyone understood that going home to eat was unacceptable. He also told O'Gorman that this was a complete reversal of what he understood before Kientzy was terminated.

O'Gorman did not ask the officers if they had ever gone home, or whether they knew any other officers who had gone home. When asked why, O'Gorman testified that he did not ask those questions because the male officers were not under investigation.

O'Gorman submitted his report within twenty-four hours after DeBlaze requested it. Although O'Gorman knew that at least three other officers (Moretto, Dixon, and Khoutek) had gone home, he did not include that information. Based primarily on this report, DeBlaze decided not to review Kientzy's termination any further.

### C.

 McDonnell Douglas argues that there is not "one iota of direct evidence of discriminatory animus on the part of any key player in the events leading to plaintiff's discharge." This observation, however, does not resolve the issue before us.

On appeal, discriminatory intent and discrimination are issues that may be determined from all of the facts in the case regardless of whether the *McDonnell Douglas–Burdine* or *Price Waterhouse* analysis is applicable. *See Finley,* 975 F.2d at 473.

■ McDonnell Douglas also argues that neither O'Gorman's decision to refer Kientzy's case to the security investigations department, nor O'Gorman's after-the-fact survey and report to DeBlaze were discriminatory. On the other hand, Kientzy argues that unlike the disciplinary steps O'Gorman took when dealing with similarly situated male officers, O'Gorman terminated the normal "chain of command" by referring her case to the security investigations department. Kientzy also contends that O'Gorman conducted his survey and wrote his report so as to preclude proper reconsideration of Kientzy's termination.

Based on the facts discussed above, a jury could have found that O'Gorman discriminated against Kientzy because of her sex, treating her differently from similarly situated male officers. Specifically, O'Gorman turned Kientzy over to security investigations, contrary to his own supervisor's practices and contrary to actions he took with regard to Buchanan before and after Kientzy's situation arose. O'Gorman testified that no male officers under him had been disciplined while he was chief of guard services, yet he referred Kientzy to security investigations knowing that guard services would be cut out of the decision making process and that she might be terminated. O'Gorman also demonstrated an intense interest in Sporleder's investigation of Kientzy, though he never followed up or investigated rumors about male employees who had gone home while on duty.

Like the supervisor in *Vaughn,* 918 F.2d at 523, O'Gorman did not counsel Kientzy as other male employees were counseled. Like the supervising officer in *Jiles,* 944 F.2d at 413, and the supervisor in *Shager,* 913 F.2d at 405, O'Gorman set Kientzy up to fail Sporleder's investigation and the committee's review by telling Sporleder that Kientzy had been leaving the facility

without permission. Finally, O'Gorman failed to follow DeBlaze's express direction to find out whether other officers had gone home, and to determine whether Kientzy had been told about the lunch policy. This treatment, essentially cutting off Kientzy's avenue for an effective review, was different from that of similarly situated males whom O'Gorman either recommended for a much less severe form of discipline (a three week suspension for violation of a written rule) or did not discipline at all.

A reasonable jury could have found that O'Gorman used Sporleder, the disciplinary committee, and DeBlaze as the conduit of his prejudice—"his cat's paw." *See Shager,* 913 F.2d at 405. The jury ultimately afforded greater credit to Kientzy's view of the facts, and we cannot change the outcome simply because McDonnell Douglas is able to present a different view. *See Morgan,* 897 F.2d at 951–52; *Glover v. McDonnell Douglas Corp.,* 981 F.2d 388, 391–92 (8th Cir.1992). In addition, the evidence is sufficient for the jury to have made its discrimination finding based on either O'Gorman's referral of Kientzy to security investigations or his failure to follow DeBlaze's explicit directions, or both. The magistrate judge, therefore, did not err in denying the motion for a directed verdict.

## II.

■ McDonnell Douglas makes three arguments regarding the jury's award of $125,000 for mental anguish and suffering and $25,000 for future mental anguish. First, McDonnell Douglas claims that emotional distress injuries which arise from an employee's employment are redressable only under Missouri workers' compensation laws; therefore, only the Missouri Labor and Industrial Relations Commission had jurisdiction over Kientzy's claim.

■ Missouri workers' compensation laws provide the exclusive remedy for injuries "arising out of and in the course of ... employment." Mo.Rev.Stat. § 287.120 (Supp.1992); *see also Waldermeyer v. ITT Consumer Fin. Corp.,* 767 F.Supp. 989, 993–94 (E.D.Mo.1991) (discussing emotional

distress which arose during the course of employment). Here, however, Kientzy's emotional distress injury did not arise in the course of her employment. Instead, her unemployment, as a result of a discriminatory discharge, caused her distress. The workers' compensation laws, therefore, do not apply.[10]

■ Second, McDonnell Douglas argues that Kientzy did not present sufficient evidence of emotional distress as required by Missouri law. McDonnell Douglas claims that Kientzy failed to present expert medical testimony as required by *Glover v. McDonnell Douglas Corp.*, 981 F.2d at 395.[11] We need not reach this issue, however, as it has not been properly preserved for review. At the close of Kientzy's case, McDonnell Douglas moved for a directed verdict, arguing with great specificity that the evidence was insufficient for finding sex discrimination. McDonnell Douglas, however, did not mention or refer to the emotional distress issue. Instead, McDonnell Douglas raised the emotional distress issue for the first time in its motion for judgment notwithstanding the verdict, or in the alternative, a new trial or remittitur. In its motion, McDonnell Douglas asserted: (1) that the evidence did not support the jury's award of $125,000 for mental anguish and $25,000 for future mental anguish; (2) that emotional distress damages are compensable only under Missouri's workers' compensation laws; (3) that Kientzy's emotional distress evidence was insufficient as a matter of law; and (4) that the court improperly instructed the jury

regarding emotional distress damages under Missouri law.

■ Under Fed.R.Civ.P. 50(a), 28 U.S.C. (1988), a motion for a directed verdict must "state the specific grounds therefor." A party who has moved for a directed verdict may then move for judgment notwithstanding the verdict, but only "in accordance with the party's motion for a directed verdict." Fed.R.Civ.P. 50(b), 28 U.S.C. (1988). Because McDonnell Douglas' motion for judgment notwithstanding the verdict raised new grounds, it exceeded what is allowed under Rule 50(b). Accordingly, McDonnell Douglas is barred from appealing the denial of judgment notwithstanding the verdict as to the sufficiency of evidence of emotional distress.[12] *See Hubbard v. White,* 755 F.2d 692, 695–96 (8th Cir.1985), *cert. denied,* 474 U.S. 834, 106 S.Ct. 107, 88 L.Ed.2d 87 (1985); *see also House of Koscot Dev. Corp. v. American Line Cosmetics, Inc.,* 468 F.2d 64, 67–68 (5th Cir.1972). In addition, although McDonnell Douglas requested that the magistrate judge grant a new trial on emotional damages, it did not seek that relief on appeal, and we decline to grant such relief.

■ Finally, in a footnote, McDonnell Douglas claims the award is "grossly excessive" and requests remittitur.

> ... In determining whether remittitur is proper, we must focus on whether "the verdict is so grossly excessive as to shock the court's conscience." ... We "will reverse a denial of remittitur only when in rare circumstances we are pressed to conclude that the verdict represents a monstrous or shocking injus-

---

**10.** Relying on *Killian v. J & J Installers, Inc.,* 802 S.W.2d 158 (Mo.1991) (en banc), and *Goodrum v. Asplundh Tree Expert Co.,* 824 S.W.2d 6 (Mo. 1992) (en banc), McDonnell Douglas also asserts that the initial determination of whether an injury is covered by workers' compensation rests exclusively with the Commission. We reject this argument as both of these cases address intentional or accidental injuries that occurred while the employee was employed. Here, however, Kientzy's injuries did not arise until after McDonnell Douglas terminated her employment.

**11.** The plaintiff in *Glover* presented no expert testimony regarding emotional distress. *Id.* at

391, 395. Here, however, a professional, licensed counselor with a master's degree in counseling testified with a "reasonable degree of professional certainty" that Kientzy suffered from an adjustment disorder with mixed emotional features. *Cf. Childs v. Williams,* 825 S.W.2d 4, 10 (Mo.Ct.App.1992).

**12.** We also note that although McDonnell Douglas properly objected at trial to the magistrate judge's instruction regarding future mental anguish damages, McDonnell Douglas has not argued instructional error on appeal. Thus, the matter has not been preserved, and we will not address it.

tice." In reviewing the District Court's actions, we operate under the clear-abuse-of-discretion standard.

*Benny M. Estes & Assocs. v. Time Ins. Co.,* 980 F.2d 1228, 1235 (8th Cir.1992) (quoting *American Business Interiors, Inc. v. Haworth, Inc.,* 798 F.2d 1135, 1146 (8th Cir. 1986)). On the facts before us, giving full consideration to the abbreviated and conclusory argument presented,[13] we cannot say that the district court clearly abused its discretion by failing to remit the emotional distress damages award.

### III.

■ McDonnell Douglas makes three arguments regarding the jury's punitive damages award. First, McDonnell Douglas contends that there was insufficient evidence to support the punitive damages award.[14] McDonnell Douglas emphasizes that the disciplinary panel's conduct was neutral, and that even if we find that O'Gorman's conduct was discriminatory, it was not sufficiently outrageous to justify punitive damages.

■ Under Missouri law, a jury may award punitive damages only when a defendant's conduct is outrageous because of its evil motive or reckless indifference to the rights of others. *Burnett v. Griffith,* 769 S.W.2d 780 (Mo.1989) (en banc). At first, the magistrate judge vacated the $400,000 award and granted a new trial on punitive damages because he determined that the punitive damages jury instruction did not adequately focus on the "state of mind and motivations of the defendant, and more specifically on those of Chief O'Gorman through whom the defendant primarily acted in a discriminatory manner." Slip op. at 15 (July 23, 1991). "[A]fter careful consideration of the motions and arguments of the parties," however, the court reconsidered and found that "the standard set forth ... complies with the law of Missouri and is supported by the evidence." Slip op. at 2 (Dec. 2, 1991). Based on the facts discussed in Section I, we conclude that a reasonable jury could have found

that O'Gorman's actions were outrageous because of his reckless disregard for Kientzy's rights. Unlike the male employees he testified he had never disciplined in three years as chief, O'Gorman set Kientzy, the only female lieutenant, on the path to discharge. Likewise, when asked to survey the officers, he ignored DeBlaze's directives and never clarified the lunch policy misunderstanding or the fact that other officers had gone home.

■ McDonnell Douglas also argues that the magistrate judge improperly instructed the jury with regard to punitive damages. Rather than requiring a finding that McDonnell Douglas' conduct was outrageous because of its evil motive or reckless disregard for Kientzy's rights, the magistrate judge instructed the jury that it could award punitive damages if McDonnell Douglas "was callously indifferent" to Kientzy's protected rights. McDonnell Douglas, however, waived any allegation of error when it failed to object. *See Doyne v. Union Elec. Co.,* 953 F.2d 447, 449 (8th Cir.1992). Moreover, as we stated in *Doyne,* we are inclined to agree that the instruction generally follows Missouri law. *Id.*

■ Finally, McDonnell Douglas requests remittitur as the award is "grossly excessive." We review only for a clear abuse of discretion. *Benny M. Estes & Assocs.,* 980 F.2d at 1235. On the facts before us, we cannot say that the district court clearly abused its discretion by failing to remit the punitive damages award.

### IV.

■ McDonnell Douglas argues that the magistrate judge erred in calculating the attorneys' fee award.

The magistrate judge awarded Kientzy $142,172.02 as reasonable attorneys' fees. *Kientzy v. McDonnell Douglas Corp.,* No. 90–584 C(1), slip op. at 8, 1992 WL 196769 (E.D.Mo. May 26, 1992). The magistrate judge first calculated the lodestar amount

---

**13.** The argument, excluding citations, was only one sentence in a footnote.

**14.** McDonnell Douglas makes no constitutional argument with respect to punitive damages.

"by multiplying the reasonable amount of time expended by the reasonable rate," for a total of $94,781.35. *Id.* at 2, 6. The magistrate judge then enhanced that amount by fifty percent for the risk of loss counsel assumed in taking a contingent fee case. *Id.* at 8.

Relying on *City of Burlington v. Dague,* —— U.S. ——, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), McDonnell Douglas asserts that the magistrate judge should not have enhanced the lodestar award for risk of loss. In *Dague,* the Supreme Court held that fee-shifting statutes do not permit enhancement of a fee award beyond the lodestar amount to reflect the fact that a party's attorneys were retained on a contingent-fee basis. *Id.* at —— – ——, 112 S.Ct. at 2643–44. The Court reasoned that "an enhancement for contingency would likely duplicate in substantial part factors already subsumed in the lodestar," because "the risk of loss in a particular case ... is the product of ... (1) the legal and factual merits of the claim, and (2) the difficulty of establishing those merits." *Id.* at ——, 112 S.Ct. at 2641. The Court stated further that although the legal and factual merits of a claim should "play no part" in the calculation of the lodestar, the difficulty of establishing the merits "is ordinarily reflected ... either in the higher number of hours expended to overcome the difficulty, or in the higher hourly rate of the attorney skilled and experienced enough to do so."

Thus, in accordance with *Dague,* we must reverse the magistrate judge's fifty percent enhancement for risk of loss. On this record, however, we cannot ascertain whether the lodestar award adequately reflected the difficulty of establishing the merits. Therefore, we remand for further consideration of this issue.

On remand, the magistrate judge should determine whether the difficulty of establishing the merits was considered. If it was part of the lodestar calculation, the magistrate judge should award the $94,-781.35 as previously calculated. If, however, it was not considered, the magistrate judge should consider that factor and modi-

fy the award if he determines an adjustment would be appropriate.

We affirm all but the calculation of attorneys' fees, which we remand for further consideration.