# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

————————————

m 99-11215
Summary Calendar

————————————

JAMES CARL WAKEFIELD,

Plaintiff-Appellant,

VERSUS

STATE FARM INSURANCE, ET AL.,

Defendants,

TERRY L. VICE, BRUCE SUTTON,
AND
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,

Defendants-Appellees.

————————————————

Appeal from the United States District Court
for the Northern District of Texas
(3:98-CV-1092-T)

————————————————

August 10, 2000

Before SMITH, BARKSDALE, and
  PARKER, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

James Wakefield sued his employer, State Farm Mutual Automobile Insurance Company ("State Farm"), and individuals employed thereby, claiming to have been discriminated against because of race. The district court granted State Farm summary judgment, and Wakefield appeals with regard to those claims that arose, purportedly, under title VII of the Civil Rights Act, 42 U.S.C. § 2000e, et seq., particularly 42 U.S.C. § 2000e-2(a)(1)-(2). Finding no reversible error, we affirm.

I.

Wakefield began working for State Farm in 1991. Terry Vice had always been the manager of his department; for much of that time, Bruce Sutton had been his second-line supervisor as one of the assistant managers. Wakefield's direct supervisor was Bart Ord.

Wakefield rose during 1992 from "job class 1" to "job class 3," then received the position of Field Maintenance Technician, at "job class 5," for which his supervisors recommended him. In December 1994, he was promoted yet again, with Terry Vice's approval, to "job class 6," as a Senior Field Maintenance Technician, and has since held that job class.

State Farm introduced a new method of evaluating employees, called a quarterly performance review ("QPR"), in January 1997. Supervisors were instructed to rate employees on a scale of "1" to "5" ("1" being the worst) in several performance categories. Each employee's direct supervisor was to make the ratings in three-month intervals calculated from his employment anniversary date (which was late December for Wakefield); each supervisor was to provide his employees with initial ratings, called "benchmark" ratings, to apprize them of their status at the inception of this new system. Ord rated Wakefield in late January 1997 as a "2" in nine of the fifteen performance categories, and as a "3" in the rest, and testified that Wakefield's benchmark ratings were the worst of any of the employees he supervised.

On April 8, 1997, Wakefield filled out an electronic form requesting consideration for the position of Structural Estimator, which carries an entry-level job class of "SF-6"SSthe same job class Wakefield then held. Wakefield forwarded the form to Ord, who recommended him for the position and forwarded the form to Sutton. When Sutton received the form, he was struck by the inconsistency of Ord's recommending Wakefield for a position such a short time after Ord had rated him so poorly on his benchmark QPR. Sutton instructed Ord to advise the Human Resources Department to put a hold on Wakefield's request for consideration so they could discuss the recommendation.

Sutton and Vice tried to convince Ord of the impropriety of rating an employee as so poor, but then recommending him for a position in another department. They also explained that they would not recommend Wakefield for the position because of Ord's low benchmark ratings of him. Vice and Sutton then instructed Ord not to recommend Wake-

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

field for the position, but to advise him that he still could submit the request for consideration anyway.

Wakefield submitted his application, which was forwarded to the hiring department by Human Resources on April 14, 1997. On April 16, Human Resources notified Ord that Wakefield would not be interviewed because his supervisors had not recommended him.

Ord mentioned to Sutton in early April 1997 that he planned to raise four of Wakefield's performance ratings from his benchmark scores of "2" to "3" for the first quarter, which concluded in late March for Wakefield (three months after his anniversary date). Sutton pointed out that less than three months had elapsed since Wakefield had received his original benchmark ratings in late January, and because they were quarterly ratings, any improvements should be based on at least three months' performance. For that reason, Sutton instructed Ord to leave Wakefield's first-quarter ratings the same as his benchmark ratings and to reflect any improvement in his job performance on the second-quarter ratings, to be issued in July. Ord made the desired changes in July.

## II.

Wakefield claims that Vice and Sutton discriminated against him on the basis of race by instructing Ord not to recommend him for the Structural Estimator position or to raise his QPR ratings until the second quarter of 1997. The district court found that neither of these actions constituted an adverse employment decision under Fifth Circuit precedent.
.

The methodology for considering a claim under title VII has been well rehearsed. As the district court explicated the process with specificity to these facts,

> [a] plaintiff must first establish a *prima facie* case of disparate treatment on the basis of race by demonstrating that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) despite his qualification, he suffered an adverse employment decision made by a defendant; and (4) he was replaced by, or received less favorable treatment than, similarly situated non-African Americans.

*Citing Crawford v. Western Elec. Co.*, 614 F.2d 1300, 1315 (5th Cir. 1980). Once the plaintiff has demonstrated his *prima facie* case, the employer is obliged to articulate legitimate, nondiscriminatory reasons for the adverse employment action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the employer can, then the inference of discrimination created by the *prima facie* demonstration disappears, and the court focuses on the ultimate question of whether the employer intentionally discriminated against the plaintiff employee. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510-11 (1993). The employee demonstrates discrimination by showing either direct evidence of discrimination or, circumstantially, that the employer's articulation of legitimate reasons for adverse treatment was pretextual. *McDonnell Douglas*, 411 U.S. at 804. Wakefield claims that he has stated causes of action under § 2000e-2(a)(1) and (2).

## A.

Section 2000e-2(a)(1) forbids employers to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race,

color, religion, sex, or national origin." *Id.* As the district court indicated, we repeatedly have held that this subsection, like the anti-retaliation provisions of § 2000e-3(a), proscribes "ultimate employment decisions, and not . . . 'interlocutory or mediate' decision[s] which can lead to an ultimate decision." *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 708 (5th Cir. 1997). *See also Burger v. Central Apartment Management, Inc.*, 168 F.3d 875, 878-79 (5th Cir. 1999). "Ultimate employment decisions include acts such as hiring, granting leave, discharging, promoting, and compensating." *Id.* at 707 (citation and internal quotation marks omitted). In the context of § 2000e-2(a)(1), at least, "employment actions are not adverse where pay, benefits, and level of responsibility remain the same." *Watts v. Kroger Co.*, 170 F.3d 505, 512 (5th Cir. 1999).

Wakefield concedes that he "did not seek a promotion"; rather, he claims to have sought "a new job opportunity," which was not a promotion but nevertheless was not a mere "transfer." Wakefield was not denied his "new job opportunity" after he had been fully vetted for it. Rather, his request for consideration was excluded preliminarily because he was not recommended by his supervisor.

A similar situation arose in *Dollis v. Rubin*, 77 F.3d 777 (5th Cir. 1995). There, an employee complained that, among other things, she had been denied a "desk audit" to determine whether promotion was in order, which denial "restricted her promotional opportunities and upward mobility." *Dollis*, *id.* at 779. We held that "none of Dollis' . . . complaints involved adverse personnel actions." *Id.* at 781. The district court drew from this holding that "*an opportunity to be reviewed* for a promotion does not constitute

an ultimate employment decision." *Citing Dollis*, 77 F.3d at 781-82 (emphasis added).

This reading is justified and is sufficient to defeat Wakefield's claim that he suffered an adverse employment action under § 2000e-2(a)(1). He, too, was denied full re-viewSSbecause of his supervisors' failure to recommend him at a specific time, based on the fact that his employment review was exceedingly poor and that sufficient time had not elapsed to allow meaningful review and reconsideration of that score under company procedure.[1]

Even if we ignore the fact that State Farm merely denied Wakefield the opportunity to participate in the promotion-selection process, rather than denying him promotion outright, we are still faced with the fact that, by his own admission, Wakefield was not seeking promotion. Rather, he sought only a "new job opportunity." As we have said, this circuit does not consider an employment action to be

---

[1] Wakefield writes in his brief:

Interestingly, in *Burger*[, 168 F.3d] at 878 . . . the [c]ourt stated that "'[u]ltimate employment decisions' include acts such as hiring, granting leave, discharging, promoting, and compensating.'" The [d]istrict [c]ourt wrote in its Order for this case that "an opportunity to be reviewed for a promotion does not constitute an ultimate employment decision" and credited *Dollis* at 781-82 as authority.

Wakefield implies that the district court contradicted itself. If Wakefield so contents, it must be because he failed to distinguish between the *act of* promoting (final promotion decisions) and the preliminary *opportunity to be reviewed* for a promotion.

an ultimate employment action, and therefore to establish a *prima facie* case under § 2000e-2(a)(1), if "pay, benefits, and level of responsibility remain the same." *Watts*, 170 F.3d at 512.

Wakefield argues that he developed, in the summary judgment record, evidence that "[t]he [job] class for this opening was MA2N and included a salary range that was higher than the highest range available in the class appellant was in at the time of his request for consideration." The portion of the record to which he points us for this proposition, however, establishes no such thing. Rather, it reflects that Wakefield would have received no raise upon transfer, that a merit review would have been available (even as it would have been available to him in his current position), and that State Farm considered the "new job opportunity" a completely lateral move.[2]

Meanwhile, Wakefield makes no pretense, beyond bare assertion, that his benefits would have changed upon his transfer to his "new job opportunity." Finally, he points out that "[t]he new job opportunity was located in another town, under different management, and included entirely different and new job responsibilities . . . includ[ing] the benefits of specialized training in claims work that was

different than any he had received."

We do not question that Wakefield's responsibilities upon transfer would have been *different*. Difference, however, is not enough. Rather, our precedent requires that Wakefield make a showing that his *level* of responsibility would have *increased*. Nothing to which he points us suggests this would have occurred. In short, Wakefield fails to make a *prima facie* case under § 2000e-2(a)(1), because he cannot show an ultimate employment action.

### B.

Wakefield also claims that he properly has stated a claim under § 2000e-2(a)(2), which forbids an employer to

> limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

*Id.* Wakefield points us to *Mattern*, wherein we explained in *dictum* that § 2000e-2(a)(2) is a "more vague proscription" that "reaches much farther than" does § 2000e-2(a)(1). Wakefield makes no effort, however, to delineate the extended reach of § 2000e-2(a)(2) except to assert that the conduct he describes falls within it.

Despite Wakefield's failure to cite it, our precedent does explicate the role and scope of § 2000e-2(a)(2). In *Carpenter v. Stephen F. Austin State Univ.,* 706 F.2d 608 (5th Cir. 1983), we explained that "[t]he *disparate impact model of [t]itle VII liability* is based on . . . § 2000e-2(a)(2)." *Id.* at 620 n.7 (emphasis

---

[2] Wakefield asserts, without citation to the record, that "the maximum salary grade for the new position is higher than the maximum salary grade for the position appellant held at the time he attempted to apply for this job opportunity." We see no support in the record for this assertion. State Farm's summary judgment evidence, meanwhile, supports the opposite conclusion: that the transfer was, from the standpoint of compensation, entirely lateral. Wakefield's conclusional assertions do not effectively oppose State Farm's evidence.

added).[3]

We have identified the procedures for making a valid disparate impact claim.

[A] a plaintiff must (1) identify the challenged employment practices or policy, and pinpoint the defendant's use of it; (2) demonstrate a disparate impact on a group that falls within the protective ambit of [t]itle VII; and (3) demonstrate a causal relationship between the identified practice and the disparate impact.

*Gonzales v. City of New Braunfels*, 176 F.3d 834, 839 n. 26 (5th Cir. 1999).[4]

Construing Wakefield's complaint with maximum generosity as a disparate impact claim, we find that the two "practices" complained of are his superiors' decisions not to allow his immediate supervisor to change

_____

[3] See also *Vaughn v. Edel*, 918 F.2d 517, 519-20, 523 (5th Cir. 1990); *Sagers v. Yellow Freight Sys., Inc.*, 529 F.2d 721, 725, 729 (5th Cir. 1976).

[4] In *Gonzales*, we faced a disparate impact claim under the Americans with Disabilities Act ("ADA") and explained that "[i]n the ADA context, a plaintiff may satisfy the second prong of his *prima facie* case by demonstrating an adverse impact on himself rather than on an entire group." *Id.* That this is true in the title VII context is demonstrated by *Vaughn*, wherein the plaintiff did not suggest that the challenged employment practicesSSdenying her timely and constructive review because of her raceSSwere carried out against all blacks, but instead demonstrated evidence that she alone was subjected to them *because she was black*. *Vaughn*, 918 F.2d at 519-20, 523. Wakefield, therefore, enjoys the same opportunity; as we explain, however, he has failed to make use of it.

his quarterly review ratings until at least three months had passed since his initial review, and not to allow that supervisor to recommend him for a transfer while his ratings were as low as originally determined, with the result that he was not interviewed for the transfer position because he had not been recommended by his superiors. By this recitation of evidence, Wakefield has satisfied the first requirement in stating a disparate impact claim.

Wakefield does not, however, satisfy the second step. He does not make any evidentiary showing that the practices complained of had the effect of harming the interests of black employees at State Farm, either anecdotally or statistically. Neither does he show that he was treated differently as a class of one for race-motivated reasons. *See Vaughn*, 918 F.2d at 519-20, 523. In short, be the group many or one, Wakefield has not demonstrated any impact particular to that group that was different from that on others at State Farm. Without such a showing, he can hardly demonstrate the third element of a *prima facie* case of disparate-impact discrimination, because he has not shown any disparity in impact.

C.

State Farm argues that even had Wakefield made out a *prima facie* case under either of the above theories, he could not have prevailed, because he failedSSonce State Farm had enunciated a legitimate, non-discriminatory justification for its actionsSSto provide any evidence that State Farm's justification was pretextual. Wakefield demonstrates no such showing of pretext, and our review of the record discloses none.

Wakefield has not shown that State Farm's policies were invented *ex post* to explain its

behavior; he did not demonstrate that the policies had been employed in discriminatory ways; he did not provide evidence, other than the unsupported and uncorroborated suspicion of his immediate supervisor, that race actually motivated his employers. Anecdotal and speculative evidence that racial considerations motivated behavior, without more, does not allow inference of the proposition that race was in fact a motivating factor.[5]

"[W]e may affirm the district court's judgment for different reasons than the district court relied upon." *Burger*, 168 F.3d 875, 878 (5th Cir. 1999). Here, we decide, not instead of but in addition to the district court's conclusion, that Wakefield failed to articulate a *prima facie* case of discrimination under title VII and that he failed as well to articulate any competent reasons to suggest that State Farm's proffered explanations for its behavior were pretextual.

AFFIRMED.

---

[5] *See, e.g., Swanson v. General Servs. Admin.*, 110 F.3d 1180, 1186 (5th Cir. 1997) (holding that "a broad, generalized statement that black employees were 'watched' more closely than whites is incompetent to establish a pattern of discrimination"); *Odom v. Frank*, 3 F.3d 839, 849 (5th Cir. 1993) (rejecting anecdotal and speculative opinion testimony concerning an "unwritten policy" discouraging advancement of older employees).