CARL E. STEWART, Circuit Judge;
dissenting:
• I am persuaded that the majority has inappropriately held John H. Bryan (“Bryan”) to a higher threshold than a plaintiff is required to meet to establish a prima facie case of employment discrimination sufficient to defeat summary judgment. Bryan has shown sufficient evidence in the record to meet the proper threshold. Accordingly, I respectfully dissent from the majority’s affirmance of the district court’s grant of summary judgment to McKinsey. & Company, Inc. (“McKinsey”), and its dismissal of Bryan’s employment discrimination suit.
I agree that, in order to make a prima facie case, a plaintiff must establish that he (1) is a member of a protected class; (2) was qualified for the position; (3) was subject to an adverse employment action; and (4) was either replaced by someone outside the protected class, or, that other similarly situated employees .outside the protected class were treated more favorably, in other words the plaintiff received disparate treatment. Okoye v. Univ. of Texas Houston Health Sci. Ctr., 245 F.3d 507, 512 (5th Cir.2001). McKinsey concedes that Bryan has established three of the elements of a prima facie ease. It asserts, however, that Bryan has failed to show the fourth element, that he was either replaced by someone outside the protected class or that similarly situated non-protected employees were treated more favorably. Bryan does not contend that he was replaced as an Associate Principal (“AP”) by someone outside the protected class'. Instead, he asserts that McKinsey employees similarly situated were treated more favorably than he in that they were retained after he was terminated, or if they were fired along with him, it was only after receiving more feedback, guidance and longer tenures.
McKinsey points to the fact that it terminated white APs around the time Bryan was terminated in arguing that Bryan has failed to show disparate treatment between himself and similarly situated white employees. While on its face that may appear to preclude a finding of disparate treatment, the inquiry does not end there. Simply showing that employees of a non-protected class were fired along with the plaintiff will not necessarily result in a *363 finding that no disparate treatment existed. For example, in Vaughn v. Edel, 918 F.2d 517, 522 (5th Cir.1990), this court held that dispensing less, or outright withholding of, performance feedback to a member of a protected class, while those from the non-protected class received a higher volume of feedback, was evidence of disparate treatment sufficient to establish a prima facie case of discrimination. We stated that by withholding negative feedback from the plaintiff, the employer created a situation where the plaintiff was unaware that her performance had declined to the point where she was vulnerable to be terminated. Id. at 522-23. In creating that unawareness, we found that the employer was not providing the plaintiff the same opportunity that it was providing to its other employees which was the chance to improve her performance and avoid termination. Id.
Bryan contends that similarly situated white McKinsey APs who were retained, and eventually promoted to partner, were given a longer period of time to develop than he was, while those white APs who were terminated along with him were given a greater amount of feedback, guidance, and firm involvement in their career development, as well as longer tenures, prior to their termination. In terms of meeting the threshold of showing a prima facie case sufficient to survive summary judgment, it is not required that Bryan prove disparate treatment, only that he show the existence of evidence on the record that raises a genuine issue of material fact as to whether disparate treatment occurred. Waltman v. International Paper Co., 875 F.2d 468, 477 (5th Cir.1989).
Bryan’s tenure as an AP at McKinsey was approximately ten months, from July 1, 2000 until May 4, 2001. Of the other APs who were also eventually terminated, all of whom were white, only one had a shorter tenure of approximately nine and one-half months. The others had tenures ranging from eleven months to nineteen months. Additionally, other white APs, who were promoted to that position along with Bryan on July 1, 2000, were retained at the firm after he was terminated. Furthermore, McKinsey employee, Suzanne Nimocks, testified that each AP was assigned a designated group leader (“DGL”) whose responsibility was, during a twice-a-year AP development meeting held among the principals, to present that DGL’s perspectives on the AP to the partnership and develop a message that the partnership would want to send back to the AP. The DGL was to then prepare a feedback memo, and deliver the memo and the feedback to the AP. In addition, the DGL was expected to have periodic conversations with the AP and provide counsel when such was sought by the AP. Nimocks also testified that there were no stringent requirements that an AP bring in clients before making principal, but rather each AP was evaluated based on the five criteria.
At the time he was terminated, Bryan’s DGL was Joe Avila (“Avila”). Avila testified that he became Bryan’s DGL in late August or early September 2000, and that he prepared Bryan’s December 2000, performance feedback. He conceded, however, that he did not recall speaking with Bryan’s previous DGL, Jeff Hawn, in regards to Bryan’s performance in the preparation of that feedback memo. The record shows that Avila met with Bryan only once in September 2000, for the purpose of telling him what would be required to continue to be a successful member of the firm.[1] Arshad Matin testified that it was *364 normal practice within McKinsey that the DGL have a face-to-face meeting with the AP to discuss performance feedback memos soon after they were prepared. By contrast, Avila did not meet with Bryan to discuss his December 2000 feedback until March 2001, three months after the feedback memo was prepared, and only two weeks before it was decided that Bryan was to be terminated. Bryan’s December 2000 performance feedback memo prepared by Avila rated Bryan very positively based on the five criteria that McKinsey focuses on in evaluating an AP’s performance. The only negative feedback it contained included recommendations that Bryan bring more focus on the client and practice fronts. It also advised him of complaints from some of his subordinates that at times Bryan’s coaching and development of them was inconsistent. The memo concluded by stating that Bryan was viewed as being a high potential consultant.
From December 2000 until April 3, 2001, when it was decided that he was to be terminated, Bryan was not given any written feedback from Avila at all. Avila further testified that he did not recall receiving anything in writing during that period concerning Bryan’s performance. Avila testified that he had not given Bryan any written feedback after the termination decision had been made. He testified that the only contact he could recall- having with Bryan during this time was when he spoke with Bryan by phone in March 2001, to find out what he was working on.[2] He did not communicate to Bryan that he was on the verge of being terminated. Avila conceded that meetings that had been scheduled between he and Bryan in January, February, and March 2001, for the purpose of discussing Bryan’s development and feedback, had been cancelled. Avila acknowledged that he had cancelled some of these meetings. The record also shows that at least two of Bryan’s white peers who became AP’s on July 1, 2000, received more written feedback than he did. For example, Peers 11 and 12 received written feedback memos in December 2000, May 2001, and June 2001.
At the summary judgment stage, Bryan is not required to marshal evidence of a quality or quantity such as would convince a jury about the full merits of his claims. All that he is required to show is evidence that creates a genuine issue of material fact that disparate treatment did occur. I am persuaded that Bryan has done so here. When he was terminated, white APs who were promoted to AP at the same time as he were retained. White APs who were promoted at the same time as Bryan but, who were eventually terminated, had longer tenures before being terminated. In terms of feedback, Bryan has shown that white APs received more written feedback. He has also shown that, contrary to the general practice within McKinsey, Bryan received very limited involvement and feedback in his career de *365 velopment from Avila, his DGL. This perspective on the record, at a minimum, shows the existence of a genuine issue of fact that Bryan was treated differently than his white counterparts. For these reasons, I respectfully dissent.

. Avila testified that he met with Bryan on December 8, 2000, in Houston to discuss the *364 December 2000, performance ■ feedback memo. However, Bryan contends that this meeting did not take place because Bryan was traveling from Austin, Texas to Fort Lauder-dale, Florida on that date, and provides an American Express travel receipt which supports this contention. Since there is no evidence except for Avila's testimony that such meeting took place, we must assume that Bryan's assertion that no meeting took place is correct.

. Bryan testified that he had a brief meeting in Avila's office in Houston in March 2001, to discuss his December 2000, feedback memo. Again, because Bryan has shown evidence that the December 8, 2000 meeting between he and Avila did not occur, we will assume that this March 2001 meeting did occur.