McClendon, j.
| gPlaintiff, Jerry Lee Baldwin, appeals the trial court’s grant of a partial summary judgment dismissing the racial discrimina *420 tion claim filed against defendants, the Board of Supervisors for the University of Louisiana System, on behalf of the University of Louisiana at Lafayette, and Nelson Schexnayder, individually, and in his capacity as Director of Athletics for the University of Louisiana at Lafayette. We reverse and remand.
FACTUAL AND PROCEDURAL BACKGROUND
In December of 1998, Mr. Baldwin was employed as the head football coach for the University of Louisiana at Lafayette (ULL). His formal contract was approved by the Board of Supervisors for the University of Louisiana System in April of 1999. On November 26, 2001, after three football seasons, Mr. Baldwin was relieved of his duties as head coach. However, the school continued to pay his salary throughout the remaining term of his contract.
On July 21, 2003, Mr. Baldwin filed a suit alleging various causes of action. By an amending and supplemental petition filed on September 17, 2004, Mr. Baldwin specifically alleged racial discrimination.
On March 21, 2005, defendants filed a motion for summary judgment asking that plaintiffs claims be dismissed. On the discrimination claim, the trial court, in its oral reasons, found “some issues or claims that are disputed, but I’m of the opinion ... that the system of the administration at the university separated its employment relationship with Mr. Baldwin for reasons that are not illegal or unlawful.” A partial judgment dismissing the racial discrimination claim with prejudice was signed on November 21, | ^OOS.[1] Pursuant to LSA-C.C.P. art. 1915 B, Mr. Baldwin filed a motion to certify the partial summary judgment as a final judgment based on the separability of the discrimination claim from the unadjudicated claims; the unlikelihood of the need to review the same issues twice, even with subsequent appeals of judgments on the other causes of action; the interest of sound judicial administration and economy; and, the absence of a just reason for delay. By an order signed on February 24, 2006, the trial court granted the motion to certify without reasons.
On appeal, Mr. Baldwin asserts that the trial court erred in failing to find that the reasons offered by ULL for Mr. Baldwin’s removal were a pretext for discrimination. Defendants assert that ULL’s reasons for removing Mr. Baldwin were valid and were not based on racial discrimination.
ARTICLE 1915 B CERTIFICATION
A partial judgment or partial summary judgment does not constitute a final ap-pealable judgment. LSA-C.C.P. art. 1915 B(l). However, the judgment may be certified as a final judgment “after an express determination that there is no just reason for delay.” Id.
Initially, we note that, although the trial court granted the motion to certify the partial summary judgment as a final judgment subject to appeal, the trial court did not provide its own analysis or reasons for the certification. Thus, under the principles enunciated in R.J. Messinger, Inc. v. Rosenblum, 2004-1664, pp. 13-14 (La.3/2/05), 894 So.2d 1113, 1122-23, we must review the propriety of the certification, on which our [Jurisdiction to hear the appeal is based, before we address the merits of the appeal.
*421 The jurisprudence has long maintained a policy against multiple appeals that foster piecemeal litigation. However, of equal importance is the need to balance judicial efficiency and economy with the need for review at a time that best serves the interests of the litigants. R.J. Messinger, Inc., 2004-1664 at p. 13, 894 So.2d at 1122. Noting that LSA-C.C.P. art. 1915 B was patterned after Federal Rule of Procedure 54(b), the Louisiana Supreme Court considered the analysis utilized by federal courts in addressing the lack of reasons for certification, and adopted from the federal jurisprudence the following non-exclusive factors to consider in deciding whether a partial judgment should be certified:
1. The relationship between the adjudicated and unadjudicated claims;
2. The possibility that the need for review might be mooted by future developments in the trial court;
3. The possibility that the reviewing court might be obliged to consider the same issue a second time; and
4. Miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and similar concerns. R.J. Messinger, Inc., 2004-1664 at pp. 13-14, 894 So.2d at 1122.
After a review of the record in light of the Messinger factors, and balancing the need for judicial administration with the need for fairness to the parties, we find that the partial summary judgment was properly certified. The claim that Mr. Baldwin was fired because he was an African-American is a separate cause of action from the unadjudicated claims based on contract. Further, it is unlikely that the need for review of the racial ^discrimination claim will be mooted by future developments in the district court on the causes arising in contract. While some of the facts in the discrimination claim may overlap with other tort claims alleged in the petition, such as the intentional infliction of emotional distress, that factor alone is not sufficient to preclude or void a certification. See H & W Industries, Inc. v. Formosa Plastics Corp., 860 F.2d 172, 175 (5th Cir.1988). From what is present in the record before us, a judgment on the discrimination claim would neither resolve nor impede the remaining intentional tort claims. Nor would it force an unnecessary second review of this essentially separate cause based on racial discrimination. A ruling on the discrimination claim appears to pose no threat to the viability of the remaining causes of action. However, a delayed reversal of the summary judgment dismissing the racial discrimination claim, that is, a reversal rendered after final judgment on the other claims brought by plaintiff, would require the parties to pursue the discrimination claim in another, separately held trial. If the summary judgment dismissing the discrimination claim is reviewed now, and reversed, it may be possible to try the discrimination claim with one or more of the other claims still pending in the court below, which could avoid unnecessary duplication of trial costs. This would benefit the judicial system and the parties. Thus, from our review, we cannot say that judicial efficiency and economy would be adversely affected by reviewing the judgment dismissing the claim of racial discrimination at this time. It appears far more likely that considerations of efficiency, economy, and fairness favor a review now, rather than later. See Custom-Bilt Cabinet & Supply, Inc. v. Quality Built Cabinets, Inc., 32, 441, pp. 15-17 (La.App. 2 Cir. 12/8/99), 748 So.2d 594, 605.
| RACIAL DISCRIMINATION CLAIM

APPLICABLE LEGAL PRECEPTS

Under Louisiana law, it is unlawful for an employer to “[ijntentionally fail or *422 refuse to hire or to discharge any individual, or otherwise to intentionally discriminate against any individual with respect to his compensation, or his terms, conditions, or privileges of employment, because of the individual’s race, color, religion, sex, or national origin.” LSA-R.S. 23:332 A(l). Racial discrimination is also unlawful under federal law pursuant to Title VII of the Civil Rights Act of 1964 and subsequent legislation. See McDonnell Douglas Corporation v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); St. Mary’s Honor Center v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); Vaughn v. Edel, 918 F.2d 517 (5th Cir.1990). Based on the commonality between federal and state anti-discrimination laws, state courts may appropriately consider a federal court’s interpretation of federal statutes to resolve similar questions concerning Louisiana statutes and the proper burden of proof sequence. Hicks v. Central Louisiana Electric Company, Inc., 97-1232, p. 3 (La.App. 1 Cir. 5/15/98), 712 So.2d 656, 658.
The plaintiff claiming discrimination has the initial burden of proof and must establish a prima facie case of discrimination. The plaintiff may meet this initial burden by showing that (1) he was a member of a racial minority; (2) he was qualified for the position; (3) he was discharged; and (4) the position was filled by a person who was not a member of the protected minority class. See McDonnell Douglas Corporation, 411 U.S. at 802, 93 S.Ct. at 1824; St. Mary’s Honor Center, 509 U.S. at 506, 113 S.Ct. at 2747; Vaughn, 918 F.2d at 521. If the plaintiff establishes a prima 17facie case, the burden shifts to the defendant who “must articulate a legitimate nondiscriminatory reason for its action. If the defendant articulates such a reason, the plaintiff must then show by a preponderance of the evidence that the defendant’s reason is mere pretext.” Vaughn, 918 F.2d at 521; see McDonnell Douglas Corporation, 411 U.S. at 802-04, 93 S.Ct. at 1824-25.
A motion for summary judgment is a procedural device used to avoid a full-scale trial when there is no genuine issue of material fact. Fagan v. LeBlanc, 2004-2743, p. 5 (LaApp. 1 Cir. 2/10/06), 928 So.2d 571, 574. Summary judgment is properly granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that mover is entitled to judgment as a matter of law. La. C.C.P. art. 966 B.
A motion for summary judgment is rarely appropriate for a determination based on subjective facts, such as intent, motive, malice, knowledge, or good faith. Bilbo v. Shelter Insurance Company, 96-1476, p. 5 (La.App. 1 Cir. 7/30/97), 698 So.2d 691, 694, writ denied, 97-2198 (La.11/21/97), 703 So.2d 1312; Sanders v. Ashland Oil, Inc., 96-1751, pp. 6-7 (La.App. 1 Cir. 6/20/97), 696 So.2d 1031, 1035. Further, issues that require the determination of reasonableness of acts and conduct of parties under all facts and circumstances of the case cannot ordinarily be disposed of by summary judgment. Granda v. State Farm Mutual Insurance Company, 2004-1722, pp. 4-5 (La.App. 1 Cir. 2/10/06), 935 So.2d 703, 707, writ denied, 2006-0589 (La.5/5/06), 927 So.2d 326.
On appeal, summary judgments are reviewed de novo under the same criteria that govern the trial court’s consideration of whether summary judgment is appropriate. Sunrise Construction and Development Corporation v. Coast Waterworks, Inc., 00-0303, p. 4 (La.App. 1 Cir.6/22/01), 806 So.2d 1, 3, writ denied, 01-2577 (La.1/11/02), 807 So.2d 235.

*423
APPLICATION OF LAW TO THE FACTS

On the motion for summary judgment, Mr. Baldwin presented what he considered to be a prima facie case of racial discrimination. He offered evidence to show that he was an African-American, his background as a high school football coach and assistant coach at LSU qualified him for the position of head coach at ULL, he was removed from his duties, and he was replaced by a white male.
To counter Mr. Baldwin’s eviden-tiary showing, ULL offered what it considered legitimate and nondiscriminatory reasons for the removal. ULL pointed to the three losing seasons comprising Mr. Baldwin’s tenure and the significant drop in game attendance, particularly in light of a pending NCAA rule that required a higher level of attendance for ULL to maintain its Division 1-A status. ULL also argued that the win/loss record and the low attendance combined to create a budget crisis that demanded an immediate change in the head football coaching position.
In response, Mr. Baldwin argued that the reasons offered by ULL were not the true reasons and were merely pretextual. As support, Mr. Baldwin highlighted evidence that he believed undermined ULL’s claim of nondiscriminatory reasons.
To rebut ULL’s reliance on the win/loss record as a nondiscriminatory basis for removal, Mr. Baldwin highlighted testimony from ULL’s personnel showing that ULL was aware that the “cupboard was bare,” that is, the ULL team was extremely weak in terms of depth and talent at the time Mr. Baldwin was hired, and that ULL realized it would take some time to turn |9the program around. In addition, although the replacement coach had two losing seasons, he was actually given a contract extension.
On the question of game attendance, Mr. Baldwin established that the attendance in his first year as head coach greatly improved over the previous year’s numbers, and asserted that the program benefited from the help of ULL’s marketing director. Mr. Baldwin argued that the subsequent drop in attendance was in part caused by the absence of a marketing director in Mr. Baldwin’s second and third seasons. In contrast, after the replacement coach was hired, the vacancy in the marketing director position was filled, and an additional person was hired to assist as a fundraiser.
As for the budget crisis, Mr. Baldwin produced testimonial evidence showing that it was of long standing and argued that it was not primarily caused by the three losing seasons or the lowered attendance. Mr. Baldwin produced deposition testimony from ULL’s president that ULL’s scheduling of “money games,” defined as games with better known and higher caliber teams, brought in more money than an average game. More so than team records or attendance, these “money games” were relied on by the administration to bolster the shortfalls in the budget. Thus, Mr. Baldwin argued, the budget crisis during his term was exacerbated by ULL’s decision not to schedule sufficient “money games,” its failure to replace the marketing director, and ULL’s failure to support Mr. Baldwin’s quest for a coach’s television show, which he believed would create more local interest in ULL football.
Mr. Baldwin also relied on a claim that he was treated differently than the prior coach and the replacement coach. For example, although the previous coach was counseled when the administration disapproved of the football program or decisions by that coach, ULL never apprised Mr. | t nBaIdwin of dissatisfaction with his per *424 formance or gave Mm the opportunity to improve before he was removed. After the new coach was hired to replace Mr. Baldwin, a marketing director and fundraiser were hired, and the new coach was given a television program. Mr. Baldwin also testified that he repeatedly reported a damaged trophy case as an eyesore that negatively reflected on the program during recruiting season. However, repair of the trophy case was not completed until after the new coach was hired. Mr. Baldwin interpreted ULL’s decisions as calculated to undermine his success, which he believed was used as a basis for his removal, when the true basis was racial discrimination.
ULL argued that Mr. Baldwin’s interpretation of the facts, and the motives assigned by Mr. Baldwin to ULL’s actions, were erroneous. ULL asserted that the television show was a decision made by the local station based on advertising, and that any delay in the repair of the trophy case arose from the school’s lack of funds and some missteps by a volunteer involved in the repair. According to ULL, the same lack of funds caused the delay in the hiring of another marketing director. Overall, ULL believed its conduct was reasonable and stated that its decisions and actions were not based on racial discrimination.
From our review, we agree that the plaintiff met his initial burden to establish a prima facie case, and that the defendants came forth with seemingly legitimate and nondiscriminatory reasons for Mr. Baldwin’s removal. At that point, Mr. Baldwin was required to show that genuine issues of material fact remained as to whether the reasons offered by ULL for the removal were a pretext for racial discrimination.
Based on the record evidence before us, we find that Mr. Baldwin successfully met his burden. The facts asserted by both Mr. Baldwin and |nULL are open to different interpretations. For example, different motives can be attributed to the decision not to hire another marketing director during Mr. Baldwin’s tenure as head coach, allegedly for financial reasons, and the hiring of a marketing director and fundraiser shortly after Mr. Baldwin was removed. The decision could be seen as an indirect method of weakening Mr. Baldwin’s attempts to improve support for the team, or may have been a totally financial decision. Similarly, the testimony on the number of variables used by the school in grading the team’s performance other than the win/loss record, and the reliance on “money games” as well as the sale of game tickets to improve the budget, could cast doubt on the legitimacy of two of the bases given by ULL for Mr. Baldwin’s removal. On the other hand, after the trial court makes various credibility determinations, ULL’s decision to remove Mr. Baldwin from his duties as head coach may be found to have a legitimate, non-discriminatory basis. Also, even though a former coach was alerted to the school’s concerns and given an opportunity to improve, the failure to alert Mr. Baldwin to ULL’s dissatisfaction with the football program’s progress may have no basis in discrimina,tion. However, if the disparate treatment was a decision based on discrimination, it is unlawful. See generally Vaughn, 918 F.2d at 521-23. In summary, these inquiries, which require credibility decisions and determinations of reasonableness of conduct, and motive and intent, are not ripe for summary judgment. See generally Bilbo, 96-1476 at pp. 10-14, 698 So.2d at 697-99.
Therefore, finding that genuine issues of material fact remain, we reverse the partial summary judgment and remand for further proceedings consistent with this opinion. Costs of the appeal are assessed *425 to defendant-appellees, the Board of Supervisors for the University of Louisiana System, |12on behalf of the University of Louisiana at Lafayette, and Nelson Schex-nayder, individually, and in his capacity as Director of Athletics for the University of Louisiana at Lafayette.
REVERSED AND REMANDED.

. Subsequently, the trial court denied defendants' motion for summary judgment on the claims of intentional or negligent infliction of emotional distress, tortious interference with contract, and breach of contract. The ruling on the claim of abuse of rights is unclear.